**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ALBERTO ALEJANDRO MAITA
ESPINOZA,

    *Plaintiff,*

v.

NICOLAS MADURO MOROS,
VLADIMIR PADRINO LOPEZ, MAIKEL
MORENO PEREZ, NESTOR REVEROL
TORRES, MANUEL RICARDO
CRISTOPHER FIGUERA, FUERZAS
ARMADAS REVOLUCIONARIAS DE
COLOMBIA, and CARTEL DE LOS SOLES,

    *Defendants.*

Case No.

JURY TRIAL DEMANDED

**COMPLAINT**

Plaintiff, ALBERTO ALEJANDRO MAITA ESPINOZA ("Maita"), alleges as follows:

## I.    INTRODUCTION AND PRELIMINARY STATEMENT

1.    This is an action for compensatory and punitive damages for torts committed in violation of international norms and against basic human rights arising out of a narco-terrorist conspiracy. Maita seeks damages for torture; crimes against humanity; cruel, inhumane and degrading treatment and punishment and arbitrary detention. Maita also seeks damages for violations of the United States Racketeering Influenced and Corrupt Organizations Act ("RICO").

2.    The ruling regime of Nicolas Maduro Moros ("Maduro") in the Bolivarian Republic of Venezuela ("Venezuela") has conspired with *Cartel de los Soles*, also known as the Cartel of the Suns ("COS"), and through its Anti-Coup Commandos ("ACC") and National Anti-

Coup Command ("NACC"), and, has used official government agencies such as *Direccion General de Contrainteligencia Militar* ("DGCIM") and the *Servicio Bolivariano de Inteligencia Nacional* ("SEBIN"), to unlawfully target Maita and inflict inhumane degrading treatment due to his perceived opposition to the Maduro regime.[1]

3.        Through ACC, and its successor, NACC, Maduro and his co-conspirators—including each of the defendants in this case—unlawfully seized control of and wielded every governmental organ of the Venezuelan state, including its national military, law enforcement, and intelligence agencies in a uniquely horrifying, government-supported narco-terrorism conspiracy in which maintaining control over the proceeds of narcotics trafficking became both the object and the *sine qua non* of the conspiracy to keep Maduro in power. Amidst widespread economic disaster in Venezuela, Maduro maintained his despotic rule through a system of patronage derived from the proceeds of a vast criminal enterprise stretching from Latin America to Europe, with a substantial portion of its operations here in the State of Florida (hereinafter the "COS Criminal Enterprise"). Dissent to his rule was a serious threat to this vital system of patronage and, thus, was brutally and systematically silenced through a pattern of attacks, arbitrary detentions, torture, extrajudicial killings, and other cruel, inhuman, and degrading treatment against his perceived political opponents.

4.        As the United Nations has explained: "[a]s the opposition has been debilitated, the executive [branch lead by Maduro] has taken on increasingly expansive powers." But for Maduro's authoritarian control over Venezuela, he and his co-conspirators would not be able to wield governmental protection to shield them from prosecution for their unlawful activities in both Venezuela and the United States, where Maduro and many of his co-conspirators have been

---

[1] Although the United States military, through Operation Absolute Resolve, forcibly extracted Maduro and *de facto* removed him from power in January 2026, the Maduro regime, by and through NACC and COS, continue to run Venezuela under Acting President Delcy Rodríguez.

indicted for narcotics trafficking.

5.       Many aspects of the COS Criminal Enterprise predate Maduro's time in power. However, since taking hold of the presidency, Maduro and his co-conspirators have assumed unchecked leadership over the COS, a criminal organization made up of loyal military officers and government officials, working in conjunction with Colombian narco-terrorists, *Fuerzas Armadas Revolucionairias de Colombia* ("FARC"). Under Maduro's leadership, COS seized control over narcotics trafficking revenue to distribute patronage to supporters of the Maduro regime. As Venezuela's economic crisis worsened, the Maduro regime became increasingly dependent on this illicit revenue.

6.       For more than a decade, COS has conspired with FARC to traffic cocaine into the United States and launder the ill-gotten gains through the United States and elsewhere with the ultimate objective of maintaining Maduro's unlawful authoritarian control over Venezuela.

7.       The Maduro regime, by and through NACC and COS, are engaged with FARC in a symbiotic system of criminal patronage used to unlawfully prop up the Maduro government. Specifically, the narco-terrorist conspiracy between FARC and COS permits Maduro and his co-conspirators to obtain and launder the proceeds of narcotics trafficking, which the regime then uses to pay its loyalists. In exchange, Maduro's regime provides FARC with material support, including access to state-controlled corporations and banks, military grade weapons, and logistical support to cocaine shipments in the form of sensitive intelligence and transportation of narcotics.

8.       To ensure their control over the various military and law enforcement agencies remained absolute, Maduro and his co-conspirators directed the unlawful detention, torture, and in some cases murder of members of the military with real or perceived ties to political opposition. In so doing, the Maduro regime spread fear, obtained coerced false confessions, discredited the opposition, and discouraged disobedience in the Venezuelan Armed Forces. One of the intended

3

benefits of this widespread intimidation was the COS's continued unchallenged control over a large portion of South American narcotics trafficking from Colombia and the associated revenue and patronage which the Maduro regime relies upon to stay in power.

9.      As a 2022 report by the United Nations found: "Venezuela's military and civilian State intelligence agencies function as well-coordinated and effective structures in the implementation of a plan orchestrated at the highest levels of the government to repress dissent through crimes against humanity." In particular, "the Venezuelan State relies on the intelligence services and its agents to repress dissent in the country. In doing so, grave crimes and human rights violations are being committed, including acts of torture and sexual violence."[2]

10.      This suit arises from the detention, torture, and cruel, inhuman, and degrading treatment of Maita. Defendants conspired with the Maduro regime, through COS, ACC, and ACC's successor, NACC, to commit cruel and horrific human rights violations. These human rights violations were acts in furtherance of the criminal conspiracy insofar as they were intended to ensure submission within the ranks of the armed forced and populace of Venezuela by spreading fear, punishing political opposition, and, in so doing, protecting the narcotics trafficking revenue the Maduro regime required to maintain its control over Venezuela.

11.      Under Maduro's influence, the Venezuelan law enforcement, military, and judiciary organs have failed their affirmative legal duties under various statutes and treaties identified elsewhere herein to respect life and prevent and punish torture, extrajudicial killings, and other cruel, inhuman, and degrading treatment. The Venezuelan judiciary directly facilitated these unlawful acts by failing to investigate credible allegations of torture or cruel, inhuman, and degrading treatment. Victims, including Maita, appeared in court with visible evidence of torture,

---

[2] *See* Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela Detailed Findings, A/HRC/51/CRP.3, September 20, 2022 (hereinafter "2022 FFM") p. 13, *available at* https://www.ohchr.org/en/hr-bodies/hrc/ffmv/index.

or stated that they had been tortured, and yet no action was taken to investigate or punish any of the perpetrators for their unlawful conduct.

12. In this case, a Venezuelan military member was accused, without sufficient evidence, of participation in attempts to overthrow the Maduro regime. The torture, extrajudicial killings, cruel, inhuman, and degrading treatment Maita complains of in this suit all arose from this same pattern of conduct.

13. Maita has exhausted all adequate and available local remedies, and none are available in Venezuela because the regime, as detailed in this Complaint, is a corrupt and violent dictatorship that suppresses and tortures dissenting citizens. Therefore, without the relief Maita seeks from this Court, his suffering will go without redress.

14. Lest the relevance of this story be mistakenly consigned to the past, before the filing of this lawsuit, Maduro and his regime thrust themselves back into the international spotlight by committing blatant election fraud to defeat political opponents. On September 12, 2024, Maduro and sixteen of his cronies were sanctioned by the U.S. Department of the Treasury "for their repression of the Venezuelan people and denial of their citizens' rights to a free and fair election."

15. Purportedly to celebrate his supposed victory, Maduro resorted to a millennia-old artifice of a dictator by decreeing October 1 to be "the beginning of Christmas" in the spirit of "peace, joy and security." Not coincidentally, this announcement came several hours after his regime issued an arrest warrant for his main political rival, the legitimate winner of the presidential election.

16. Unfortunately, these actions clearly demonstrate that, unlike the converted antagonists of classic holiday literature, the villains of this story stubbornly persist in their roles without any signs of remorse or repentance. Because of these architects of atrocity, honest, brave, and patriotic citizens of Venezuela continue to suffer today from the same violent oppression

experienced by Maita.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this case under the Torture Victim

Protection Act of 1991 ("TVPA") 28 U.S.C. § 1350, note, § 2(a), and 28 U.S.C. §§ 1331, 1332,

1350, and 1367.

18.     Title 28, United States Code, Section 1350 provides a federal forum for and

accords federal jurisdiction to "any civil action by an alien for a tort only, committed in violation

of the law of nations or a treaty of the United States."  This is a civil action where the plaintiff is

not a United States citizen.  Defendants committed torts in violation of the following treaties of the

United States:

(a)     International Covenant on Civil and Political Rights, *adopted* Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976) (*ratified by the United States, June 8, 1992)*.

(b)     Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20 (1988) *reprinted in* 23 I.L.M. 1027 (1984) (entered into force, June 26, 1987).

19.      Defendants also committed torts in violation of the law of nations, as codified in

the following international agreements and declarations:

(a)     Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, at 71 (1948).

(b)     The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N, GAOR, Supp. No. 18, at 40, U.N. Doc. A/7218 (1968).

(c)     The Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 183/9 (1998), reprinted in 37 I.L.M. 999, *signed but not ratified by the United States* (not yet in force).

(d)     Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR, 28th Sess., Supp. No. 30A, at 78, U.N. Doc. A/9039/Add.1 (1973).

(e)     Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452 (XXX), U.N. GAOR, 30th Sess., Supp. No. 34, at 91, U.N. Doc. A/10034 (1975).

(f)    United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. GAOR, 24th Sess., Annex, U.N. Doc. A/CONF/611, Annex I, (1957), approved July 31, 1957, E.S.C. Res. 663(c), 24 U.N. ESCOR, 24th Sess., Supp. No. 1, at 11, U.N. Doc. E/3048 (1957), amended E.S.C. Res. 2076, 62 U.N. ESCOR, 64th Sess., Supp. No. 1, at 35, U.N. Doc. E/5988 (1977).

(g)    American Convention on Human Rights, opened for signature Nov. 22, 1969, O.A.S.T.S. No. 36, at 1, O.A.S. Doc. OEA/Ser.L.V./II.82 (entered into force July 18, 1978).

(h)    American Declaration of Rights and Duties of Man, O.A.S. Res. XXX, O.A.S. Doc. OEA/Ser.L.V/II.82 doc. 6, rev. 1 (1992).

(i)    Inter-American Convention to Prevent and Punish Torture, opened for signature Dec. 9,1985, O.A.S.T.S. No. 67, at 13, O.A.S. Doc. OEA/Ser.A/42 (SEPF) (entered into force Feb. 28, 1987).

20.    Asserting jurisdiction is also appropriate here because it is the express policy of the United States not to provide safe harbor for individual perpetrators of human rights abuses when they are found present in the United States. *See* Br. of the United States in *Kiobel* at 5; *see also* United States Statement of Interest in *Ahmed v. Magan*, No. 2:11-cv-00342 (Dkt. 45) at ¶ 9 (Persons in the United States "ordinarily should be subject to the jurisdiction of our courts").

21.    Claims in this Complaint also touch and concern the territory of the United States because the underlying conduct was part of a scheme to unlawfully traffic drugs into the United States in exchange for funds used to pay the military and law-enforcement units Maduro has used to stay in power, by carrying out human rights abuses such as those alleged herein. These actions represent criminal activity against which the United States has taken prosecutorial action.

22.    Holding individual perpetrators accountable in civil court "is consistent with the foreign relations interests of the United States, including the promotion of respect for human rights." *See* Br. of the United States in *Kiobel* at 19.

23.    This Court has personal jurisdiction over Defendants under the Florida long-arm statute, consistent with the Due Process Clause of the U.S. Constitution, because they, personally and/or through agents, unincorporated associations, and/or co-conspirators, committed tortious and criminal acts within the State of Florida that provided the funding, resources, and political power necessary to commit the acts giving rise to Maita's claims. Such tortious and criminal acts were purposefully targeted at the United States, primarily concentrated in the State of Florida, and

executed for the express purpose of exerting political control and perpetrating human rights violations in Venezuela, such as those at issue in this case.

24. This Court also has personal jurisdiction over Defendants to the extent that they are domiciled in this District and/or are served here.

25. For those Defendants who do not reside within the United States, this Court has personal jurisdiction pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. The claims alleged herein arise under federal law, those Defendants are not subject to the jurisdiction of any state court, and the exercise of federal jurisdiction over Defendants is consistent with the Constitution and laws of the United States. Defendants conspired to purposefully direct massive drug trafficking activities into the United States, including the Southern District of Florida, and the injuries alleged herein arose out of the combination of funding and political power cultivated through that long-standing drug trafficking conspiracy.

26. The United States District Court for the Southern District of Florida is a proper venue for this action pursuant to 28 U.S.C. § 1391. Defendants conspired to put into action a drug trafficking enterprise that resulted in substantial volumes of illegal narcotics passing through this District and producing revenue that was then returned to Venezuela to support the illegal acts alleged herein.

27. For instance, numerous cartel operatives have been indicted in this District for their unlawful narcotics trafficking activities *See United States v. Luis Martin-Olivares*, No. 15-cr-20299 (S.D.Fla); *see also United States v. McTurk-Mora,* No. 13-cr-20930 (S.D. Fla.); *United States v. Itriago,* No. 13-cr-20050 (S.D. Fla.).

28. In addition to raising funds for terrorist acts through narcotics trafficking activities in the State of Florida, members of the COS Criminal Enterprise have also been indicted in this District for conducting extensive money laundering activities within the State of Florida *See United States v. Luis Alfredo Motta Dominguez,* 19-cr-20388; *see also United States v. Francisco Convit Gurceaga, et. at.* 18-MJ-03119; *and United States v. Maikel Moreno Perez*, 23-20035-CR. But for their ability to dole out patronage to their supporters and agents in the NACC from the illicit criminal proceeds they laundered through the State of Florida, the COS and its co-

conspirators in the Maduro regime would not have had the means to immunize themselves from prosecution or ouster from power for their unlawful acts and oppressive treatment of these Plaintiffs and the people of Venezuela.

### III.   UNITED STATES CONCERN IN THIS CASE

29.   The wrongful conduct alleged herein was committed as part of the conspiracy by the Maduro regime, in concert with COS and FARC, to utilize proceeds derived from unlawful narcotics trafficking to generate revenue for the Maduro regime to pay the military and law enforcement agents it needs to stay in power. To maintain control over the proceeds of this unlawful criminal enterprise, Maduro created the ACC and its successor, the NACC to spread a culture of fear to dissuade opposition activities against his regime through a campaign of torture, cruel, inhuman, and degrading treatment, and extrajudicial killing, including those acts alleged herein.

30.   The United States has sanctioned the Maduro regime, and a large number of Venezuelan government officials, in connection with human rights abuses and anti-democratic activity.

31.   The United States has successfully sought extradition for individuals charged with exploiting the authority of Venezuela's government and military to corrupt Venezuelan institutions, abuse the Venezuelan people, and to import cocaine to the United States.

32.   According to the Department of Justice, law enforcement has seized upwards of $450 million dollars' worth of property in South Florida related to the COS Criminal Enterprise.

33.   Several individual defendants have been indicted by federal grand juries in prosecutions brought by the U.S. Department of Justice for their part in the narco-terrorist conspiracy between the COS and FARC. Some are in custody, while others will likely remain fugitives from justice.

34.   Together, Defendants have conspired to render the Venezuelan justice system a tool of their will and routinely mete out severe reprisals for those who oppose them. Maita's legal options against the Defendants in Venezuela are effectively foreclosed, leaving the United States as the only forum to obtain a remedy.

9

### IV.   **PARTIES**

35.     Plaintiff, Alberto Alejandro Maita Espinoza, is an individual and citizen of Venezuela, where he resided for the majority of his life. In 2010, Maita enlisted in the Venezuelan Army. Upon completing his studies at the military academy, Maita joined the special forces. Throughout his military career, Maita demonstrated exceptional service and was promoted on multiple occasions, ultimately attaining the rank of First Lieutenant. Following his unlawful detention and torture by the Venezuelan authorities, Maita was granted asylum in the United States, where he currently resides in New York.

36.     Defendant COS is a Venezuelan drug-trafficking organization controlled by Maduro and several others. It is an unincorporated criminal association based in Venezuela that acts by and through its individual members. According to the United States Department of Justice, COS and its leaders "expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation."[3] Several senior members of COS are incarcerated in the U.S., including (Former) Major General Cliver Alcala Cordones, who is charged with conspiracy to commit narco-terrorism, conspiracy to import cocaine, and associated firearms charges.

37.     Defendant FARC is a terrorist organization which became, between 1999 and 2021, one of the largest producers of cocaine in the world. In connection with its narco-terrorist activities, FARC has consistently perpetrated acts of violence against U.S. nationals and property. The United States designated FARC as a Foreign Terrorism Organization from October 8, 1997, until December 1, 2021. Although it was nominally disbanded by a 2016 Peace Accord with the Colombian government, FARC lives on to this day via splinter groups such as the Revolutionary Armed Forces of Colombia – People's Army, and Segunda Marquetalia, who are themselves designated terrorist organizations. FARC is an unincorporated criminal association based in Colombia that acts by and through its individual members, with operations throughout South America, Central America, and the United States. Certain senior leaders, such as Juvenal Ovidio Ricardo Palmera Pineda, are

---

[3] *See* Press Release, U.S. Dep't of Justice, Nicolas Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking, and Other Criminal Charges § 3 (March 26, 2020), *available at* https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism.

imprisoned in the United States.

38.     Defendant Maduro, the President of Venezuela, was born on November 23, 1962, in Caracas, Venezuela. On July 31, 2017, the U.S. Department of Treasury, Office of Foreign Asset Control ("OFAC") sanctioned Maduro for undermining democracy in Venezuela. On March 26, 2020, the Department of Justice indicted Maduro for orchestrating a "corrupt and violent narco-terrorism conspiracy between the Venezuelan [COS] and [FARC]." He has directed and/or coordinated a large volume of acts in furtherance of the COS Criminal Enterprise within the Southern District of Florida. Maduro is a citizen of Venezuela and, until recently, resided in Venezuela where he openly, notoriously, and unlawfully controlled the country. He now resides in New York, where he has been detained pending trial.

39.     Defendant Vladimir Padrino Lopez ("Padrino Lopez") was born on May 30, 1963, in Caracas, Venezuela and at all times material was the *de facto* Minister of Defense of Venezuela. On September 25, 2018, OFAC imposed sanctions on Padrino Lopez, identifying him as a "member of [Maduro's] inner circle and lifelong member of the Venezuelan military" who Maduro appointed to "help ensure the military's loyalty to the Maduro regime."[4] Padrino Lopez was indicted in the United States District Court for the District of Columbia. The indictment alleges that from March 2014 until May 2019, Padrino Lopez conspired with others to distribute cocaine on board an aircraft registered in the United States. He knowingly joined, furthered, and/or directed acts undertaken by the COS Criminal Enterprise that occurred within the State of Florida. Padrino Lopez is a senior member of the COS and the NACC and is a citizen and resident of Venezuela, where he remains a fugitive from justice.

40.     Defendant Maikel Moreno Perez ("Moreno") was born on December 12, 1965, in El Tigre, Anzoátegui, Venezuela. In May 2017, OFAC sanctioned Moreno for "judicial rulings . . . that have usurped the authority of Venezuela's democratically-elected legislature."[5] He has also

---

[4] *See* Press Release, U.S. Dep't of the Treasury, Treasury Targets Venezuela President Maduro's Inner Circle and Proceeds of Corruption in the United States (Sept 25, 2018), *available at* https://home.treasury.gov/news/press-releases/sm495.

[5] *See* Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice (May 18, 2017), § 1, *available at* https://home.treasury.gov/news/press-releases/sm0090.

been criminally charged in this District as with conspiracy to commit money laundering in the State of Florida and money laundering in connection with the corrupt receipt of millions of dollars and bribes to illegally alter the outcome of dozens of civil and criminal cases in Venezuela. In furtherance of the COS Criminal Enterprise, Moreno spent and received larger sums of money within this District. At all times material, and beginning in 2017, Moreno was the President of the Supreme Tribunal of Justice of Venezuela. Under Moreno's leadership, courts subordinate to this tribunal have abandoned the rule of law and wielded judges loyal to Maduro to carry out the will of his regime. Judges under the influence of Moreno and the NACC have violated due process, ignored credible allegations of torture and human rights violations, and imprisoned individuals on the mere basis of real or perceived ties to political opposition. Judges who refused to carry out the will of Maduro, Moreno, and COS were imprisoned and threatened with death, creating a climate of terror for judges and prosecutors who feared retaliation for complying with the law.[6] Moreno is a citizen and resident of Venezuela and a fugitive from justice.

41.     Defendant, Nestor Reverol Torres ("Torres") was born on October 28, 1964, in Maracaibo in the State of Zulia, Venezuela. Torres is the former General Director of Venezuela's government agency charged with fighting narcotics production and trafficking. Torres is a senior member of COS. In 2016, a federal grand jury in the Eastern District of New York indicted Torres for offenses including trafficking and distributing cocaine. He was directly involved in the transportation of narcotics into the United States, including the State of Florida. On July 26, 2017, OFAC imposed sanctions on Torres for "undermining democracy in Venezuela."[7] He is a citizen of Venezuela and a fugitive from justice.

42.     Defendant Manuel Ricardo Cristopher Figuera ("Figuera") is a Venezuelan citizen

---

[6] *See* 2020 FFM p. 39–43; *see also* 2018 OAS Report p. 199–203 (citing testimony from a former prosecutor, judge, and former Attorney General as "proof of a judicial system that has been completely coopted by the Executive . . . to falsely prosecute opposition leaders, or anyone. . . at odds with the Government").

[7] *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela, ¶ 1 (July 26, 2017) ("July 26, 2017 OFAC Press Release") *available at* https://home.treasury.gov/news/press-releases/sm0132.

born on November 8, 1963, in Punta de Mata, Monagas, Venezuela. From 2014 until October 2018, Figuera was the Deputy Director of DGCIM. Between October 2018 and April 2019, Figuera served as Director of SEBIN. During his tenure, SEBIN received and executed unlawful orders from Maduro and others as to who to detain, who to torture, and who to release. Despite personal awareness that widespread torture was occurring, he faithfully carried out orders to facilitate the acts of arbitrary detention and torture alleged herein. Figuera currently resides in the United States, upon information and belief in the State of Florida, after defecting from the Maduro regime.

## V. NON-PARTY CO-CONSPIRATORS

43.     Hugo Armando Carvajal-Barrios ("Carvajal") was born on April 1, 1960, in Puerto La Cruz, Venezuela. Carvajal was the former director of DGCIM and a senior member of COS. He, along with Maduro and Diosdado Cabello, was one of the primary authors of the narco-terrorism conspiracy between COS and FARC. In that role, Carvajal conspired with FARC to transport and distribute large cocaine shipments into the U.S. and elsewhere. His activities caused large quantities of previously seized cocaine to be sold to drug traffickers in exchange for millions of dollars. He also interfered with drug-trafficking investigations and pending criminal cases in Venezuela and provided FARC with military-grade weapons. Carvajal was indicted for conspiracy to commit narco-terrorism, conspiracy to import cocaine, and associated firearms charges.[8] In June 2025, he pleaded guilty to conspiracy to import cocaine into the United States, engaging in narco-terrorism for the benefit of FARC, and related weapons offenses. Carvajal's contributions to the COS Criminal Enterprise resulted in substantial unlawful narcotics trafficking and the laundering of its proceeds throughout this district. Carvajal is currently in United States custody.

44.     Diosdado Cabello Rondón ("Cabello") is a Venezuelan citizen born on April 15, 1963, in El Furrial, Monogas State, Venezuela. He currently resides in Venezuela and was appointed in August 2024 as the Minister of Internal Affairs, Justice and Peace, the agency overseeing the

---

[8] *See* U.S. Department of State, Wanted: Narcotics Rewards Program Targets – Hugo Armando Carvajal Barrios – New Target March 26, 2020, *available at* https://2017-2021.state.gov/hugo-armando-carvajal-barrios-new-target.

national police forces. Cabello was the President of Venezuela's illegitimate National Constituent Assembly from June 2018 until December 2020. Cabello has served as the longtime Vice-President of the United Socialist Party of Venezuela and an officer in the Venezuelan Army, reaching the rank of Captain. Cabello was responsible for giving orders to torture or kill specific individuals who opposed the Maduro regime directly to organs of Venezuela's intelligence services, including SEBIN and DGCIM, and those orders were then disbursed to other directorates. Cabello is a senior member of COS and served as the chairman of ACC and a member of its successor, NACC. In a recent public address regarding several political opponents following Maduro's supposed electoral victory, Cabello said "[t]hey're hiding like rats but we're going to grab them."

45.     Major General Gustavo Enrique Gonzalez Lopez ("Lopez") was born on November 2, 1960, in Miranda, Venezuela. He became the Director of SEBIN on February 17, 2014, left the post on October 31, 2018, only to return in April 2019. Under Lopez's leadership, SEBIN facilities have participated in widespread and well documented incidents of arbitrary detention, torture, extrajudicial killing, and other cruel inhuman and degrading treatment of opponents to the Maduro regime and have also provided intelligence to such operations by assisting with the selection of targets. Lopez previously served as the Minister of Interior, Justice and Peace from March 10, 2015 until August 3, 2016. In 2017, he was promoted to General-in-Chief of the military. Gonzales Lopez is also a member of NACC.

46.     Ivan Rafael Hernandez Dala ("Dala") was born on May 18, 1966, in Caracas, Venezuela and currently resides in Venezuela. In January 2014, Maduro appointed Dala as Commander of DGCIM. Upon information and belief, at the time of the incidents alleged herein, Dala was in command of DGCIM and at the facilities named herein at which Maita suffered torture and other cruel, inhuman, and degrading treatment. Upon information and belief, Dala, along with Defendant Figuera, were present during and involved with Maita's interrogation and torture. Despite Dala's personal awareness that widespread torture was occurring, he took no concrete actions to prevent or punish the perpetrators of torture under his command.

47.     Rafael Antonio Franco Quintero ("Quintero") was born on October 14, 1973, and currently resides in Venezuela. Qunitero was the director of Special Directorate of Criminal and

Criminalistics Investigations (DEIPC), a division of DGCIM, from November 2016 until November of 2018. He was first brought into DGCIM by former DGCIM Director Hugo Carvajal before 2013. During his time as director of DEIPC, he held the rank of Colonel directly under DGCIM's Deputy General Director and General Director. As director of DEIPC, Quintero led investigations against intelligence targets and alleged military dissidents. Since 2014, Quintero received orders directly from General Director Dala and gave orders to subordinates to carry out torture and other forms of ill treatment. Quintero maintained an office in the basement so he could follow developments on the floor where detention cells used for torture were located. Under his leadership, the frequency and intensity of torture conducted in DGCIM facilities increased substantially, and Quintero took part personally. Quintero ordered the investigation, wrongful arrest, and detention of Quiroga on May 18, 2018, and was responsible for the torture and cruel and inhuman treatment suffered by Marchena between 2016 and 2019. Rather than being punished for his open and notorious conduct, Maduro promoted Quintero to Brigadier General in 2020.

48.     Upon information and belief, Carlos Enrique Teran-Hurtado ("Teran-Hurtado") currently resides in Venezuela. Teran-Hurtado was the DGCIM officer responsible for the detention facilities at DGCIM Boleita.

## VI.     STATEMENT OF FACTS

### A.     The Maduro Regime's Narco-Terrorist Conspiracy with COS Captures Illicit Revenue Streams from Narcotics Trafficking in Florida to Feed Maduro's Terror and Repression in Venezuela.

49.     Venezuela has suffered from pervasive lawlessness and repression since the rule of President Hugo Chavez. Key leaders of Venezuela's ruling party, *Partido Socialista Unido de Venezuela* ("PSUV"), have conspired to maintain power indefinitely regardless of electoral legitimacy.

50.     From in or around 2013 and until recently, Maduro, a longtime member of the PSUV, was president of Venezuela and commander-in-chief of its armed forces.

51.     After rising to power, Maduro and his co-conspirators assumed leadership over

COS. Working with FARC, these Maduro allies seized control over narcotics trafficking revenue in order to distribute political patronage. As Venezuela's economic crisis worsened, the Maduro regime became increasingly dependent on securing and growing this illicit revenue, an effort that required the ability to maintain control over agents of the Venezuelan military, law-enforcement agencies, and the judiciary. Cultivating this illicit revenue stream also required the identification and maintenance of clandestine markets for the sale of unlawful narcotics and the laundering of those proceeds.

52.     At all times relevant to this case, COS has conspired with FARC to traffic cocaine into the United States, including the State of Florida, and launder the associated revenues with the ultimate objective of maintaining Maduro's unlawful authoritarian control over Venezuela.

53.     The Maduro regime, by and through NACC and COS, are engaged with FARC in a symbiotic relationship. Specifically, FARC and COS engage in a narco-terrorist conspiracy allowing Maduro and his co-conspirators to obtain and launder the proceeds of narcotics trafficking, much of which was laundered through the State of Florida and then used to pay patronage to loyalists who carry out other acts in furtherance of the conspiracy, such as those giving rise to the injuries complained of herein.

54.     A key player in this symbiotic drug-trafficking relationship was Torres. From his position as the leader of the Maduro regime's drug-enforcement agency, he was able to protect, direct, and facilitate the transfer of illegal narcotics out of Venezuela and into the United States. Torres was indicted in the United States for these activities on January 21, 2015.

55.     Supported by payments derived from the proceeds of these narco-terrorism activities, Maduro's patronized loyalists, including Padrino Lopez, Moreno, Torres, and Figuera, carried out his will to maintain political control by terrorizing the Venezuelan people to dissuade any political opposition. In turn, Maduro, through COS and NACC, used his control over

Venezuela's military, law enforcement agencies, and judiciary to shield his co-conspirators from prosecution for their activities and providing COS and FARC with the support needed to ensure the safe and clandestine delivery of cocaine shipments.

56.     The key to the success of COS is fourfold: (1) COS members have utilized their positions as government officials, under color of law, to provide logistical support to FARC's cocaine trafficking operations in the United States; (2) COS members maintain control over the proceeds of the cocaine trafficking operation which have replaced oil revenue as the Maduro regime's primary means of financial support; (3) COS members have placed high ranking co-conspirators, like Padrino Lopez, Torres, and Moreno, in control of military, law enforcement, and judicial agencies which would otherwise be responsible for putting a stop to their unlawful conduct; and (4) COS members maintain a culture of fear to dissuade dissent in the ranks of those same military and law enforcement agencies.

57.     FARC's conspiracy with COS to traffic cocaine is the *sine qua non* without which the Maduro regime would not have the funding to dole out the patronage it uses to stay in power and continue to commit human rights abuses such as those alleged herein.

58.     As shown by the indictments in the cases of Pedro Luis Martin-Olivares, Rodolfo McTurk-Mora, and Jesus Alfredo Itriago, from as early as 2000, corrupt officials within the Venezuelan government acting on behalf of COS have distributed cocaine into the State of Florida, and elsewhere in the United States, and have impeded the investigation thereof.

59.     In addition to narcotics trafficking, as shown by U.S. indictments against officials of Venezuela's national oil company, the Petroleos de Venezuela, S.A. ("PDVSA")—including Moreno—COS has conducted extensive money laundering activities within this District as recently as August 2018. According to OFAC, the PDVSA is the Maduro regime's primary conduit for corruption. In the process, it has become so indistinguishable from COS that Courts of this District

have recognized PDVSA as an instrumentality of COS. *See Osio v. Maduro*, Case No. 1:21cv20706, ECF No. 110 at 7.

60.     In March 2020, the U.S. Department of State offered a reward of up to $10 million for information leading to the arrest of Cabello or Carvajal, and $15 million for information regarding Maduro. Therein, Cabello, Carvajal, and Maduro are identified as personally coordinating exchanges of cocaine and weapons between COS and FARC, as well as paving the way for the international distribution of cocaine into, among other locations, the United States.

**B.     The Maduro Regime Deployed Plan Zamora to Maintain Control Over the COS Criminal Enterprise by Crushing Dissent in Venezuela through Widespread and Systematic Attacks Against Its Civilian Opposition.**

61.     Since the earliest days of their involvement in the COS Criminal Enterprise, Maduro, Cabello, Carvajal, and their co-conspirators have been concerned that instability in Venezuela could disrupt their control over the proceeds of narcotics trafficking. During a 2009 meeting with a FARC representative regarding a four-ton cocaine shipment, Maduro, Cabello, and Carvajal discussed a recent *coup d'etat* in Honduras, which Cabello warned could result in instability which could "fuck up the business."[9]

62.     In January 2014, economic decline, inflation, and social insecurity combined to create widespread strife and instability in Venezuela. In response, a group of opposition leaders initiated a campaign to remove President Maduro from office. The effort was referred to as *La Salida*: "the Exit." Had *La Salida* succeeded in wresting power from Maduro and his co-conspirators, the conditions under which they continued to enjoy the patronage of the COS Criminal Enterprise with impunity from criminal prosecution would have likely ceased to exist.

63.     Students in the state of Tachira were the first to organize protests in support of *La Salida* and the Maduro regime responded by arresting and detaining the students, causing solidarity protests to spread all around the country.

---

[9] *See* Superseding Indictment at 12, ¶ 15(h) *United States v. Maduro Moros*, No. 1:11-cr-205.

64.     On February 12, 2014, three people were shot and killed during protests. That same day, Maduro accused the opposition of inciting chaos and violence and prohibited "unauthorized protests." Maduro also created ACC to "continue defeating the fascist coup in Venezuela." Shortly thereafter, the opposition leader who called for the protests was arrested.

65.      The ACC was assembled by Maduro from members of the armed forces and civilian groups for the purpose of preparing a "zone by zone" and "name by name" plan to prevent a coup.[10]

66.     In or around December 2014, following a sharp global fall in oil prices, Venezuela's economy deteriorated even more rapidly. By December 2015, a collation of opposition parties had won two-thirds of the seats in the elections for Venezuela's national legislature, the National Assembly. Before the newly elected legislators took office in January 2016, the outgoing National Assembly quickly selected 13 judges and 21 alternates to the Supreme Court, all of whom were loyal to Maduro.

67.     In 2015, by Presidential Decree No. 1605, Maduro gave DGCIM, then led by his co-conspirator, Dala, broad powers to "conduct, coordinate, and execute activities aimed at the discovery, prevention and shutdown of enemy activity." Maduro also tasked Dala's DGCIM to "prevent and cut off the intelligence, counterintelligence, and subversive activities of enemies acting against the Bolivarian National Armed Forces."

68.     Between March of 2014 and February of 2015, several senior military officers, mostly from the aviation sector, were accused of a conspiracy to violently overthrow the Maduro regime. In one case, which Maduro called "Golpe Azul", military officers were accused of an alleged plan to attack his residence, Miraflores Palace.

---

[10] *See* 2020 FFM p. 16 (citing to video files on YouTube which are no longer available to the public because the accounts that posted them were terminated); *see also* 2014 Annual Report of the Inter-American Commission on Human Rights (IACHR), ¶ 353 (links to videos that remain available in which Maduro makes these statements in his own words).

69.     Cabello, from his prominent position as the president of the illegitimate National Constituent Assembly, widely disseminated the regime's false and misleading allegations about Golpe Azul on his television program, *Con Al Mazo Dando*.[11] Despite the widespread and public circulation of these claims, the regime never substantiated them by offering evidence at the trial of any of the accused.

70.     Throughout 2016, at Maduro's direction, the Supreme Court consistently declared laws passed by the new National Assembly unconstitutional. Between December 2015 and August 2016, the Supreme Court made several rulings alleging irregularities and contesting the legitimacy of several officials. The Supreme Court's rulings effectively reduced the opposition's two-thirds majority to a simple majority.

71.     In March 2016, the opposition advanced a referendum to recall Maduro in accordance with the procedural steps required by Venezuelan law. Hundreds of thousands of Venezuelans participated in protests demanding that the referendum proceed. The Maduro regime responded by suspending the recall process. The National Assembly responded in turn by announcing they would impeach Maduro.

72.     In defiance of the Supreme Court, the duly elected National Assembly swore in the contested officials. On September 2, 2016, in an effort to eliminate political opposition, the Supreme Court, then led by Moreno, held the National Assembly in contempt and declared all its acts were "manifestly unconstitutional and absolute null and lacking all validity and legal effect." Following that holding, the powers of the legislature were progressively limited and executive powers broadened through a series of presidential decrees declaring a "state of exception and economic emergency." The Moreno-led Supreme Court ruled these measures constitutional and held that the National Assembly was powerless to legislate in any matter covered by the state of exception which was now reserved to

---

[11] *See* 2020 FFM p. 71, (citing YouTube Video, teleSURtv. Diosdado Cabello difunde pruebas sobre intento de Golpe en Venezuela, 13 February 2015, *available at* https://www.youtube.com/watch?v=7mZIaTmUr4o; YouTube Video, Últimas Noticias, Nombres de los militares involucrados en la "Operación Jericó", 12 February 2015, *available at* *https://www.youtube.com/watch?v=RqxUh12Ctus*).

Maduro.

73.     In January 2017, also in response to real or perceived opposition to his authoritarian control over Venezuela, Maduro formed the NACC; an organization of high-ranking PSUV members loyal to him. Maduro's stated purpose for the NACC was "persecuting, attacking, and intimidating the internal enemy."[12]

74.     In March 2017, the Maduro-controlled, Moreno-led Supreme Court escalated the crisis by issuing two judgments that disrupted Venezuela's constitutional order. The first ordered that Maduro to take broad "civil, economic, military, criminal, administrative, political, legal, and social measures" to ensure governability in the country. The Supreme Court also called the acts of the National Assembly "treason." The following day, the Supreme Court assumed the legislative powers of the National Assembly. The Court's actions enraged the people of Venezuela, sparking thousands of protests throughout the country.

75.     In April 2017, defendant Padrino Lopez, Venezuela's Minister of Defense and a member of the NACC, developed "Plan Zamora" with the objective of maintaining "internal order" in the country.[13] Padrino Lopez also issued Resolution No. 008610, an unlawful standing order authorizing the use of deadly force by security forces against protestors.

76.     On April 19, 2017, in response to escalating protests, Maduro announced the activation of the "green phase" of Plan Zamora with the objective of maintaining "internal order." He described the plan as a "joint civil-military" operation, involving military, police, and civilian forces to "defeat the *coup d'état*," which he claimed was planned by the United States. On May 1, 2017, Maduro also enacted a decree creating the "National Constituent Assembly;" an illegitimate legislative body formed with the objective of transforming the state, creating a new legal system, and rewriting the Constitution.

---

[12] *See* 2018 OAS Report p. 50 (citing to video files which were widely broadcasted by Venezuelan and Latin American media outlets where President Maduro describes the purpose of the NACC).

[13] *See* 2020 FFM p. 296.

77. At this same time, Torres, acting as the Interior Minister, supported the regime's campaign of arbitrary detentions, torture, and extrajudicial killings of political opponents through his ability to wield the power of the Bolivarian National Police forces. Despite widespread human rights abuses under his command, Torres continued to be promoted and elevated by Maduro.

78. Amidst this ongoing strife, the Venezuelan Observatory for Social Conflict documented 9,787 protests, with the highest number occurring between April 1 and July 31, 2017. In June of 2017, Maduro responded via a televised statement: "We will go into combat. We will never surrender. What could not be done with votes, we will do with arms. We will liberate our nation with arms." Between 2017 and the present, Maduro and his NACC carried out his threats by wielding Plan Zamora to kill and torture hundreds of Venezuelans.

79. January 2018 represented an escalation point in the conflict between Maduro and his political opposition. The Supreme Court issued a ruling that the opposition coalition could not participate in the upcoming elections, causing calls for a boycott of the 2018 elections. Many neighboring nations spoke out against the elections, alleging that measures were not in place to ensure they were free, transparent, and democratic. These calls went unanswered, and Maduro was unlawfully elected to a second six-year term on May 20, 2018.

80. Maita was among the military officers arrested during this tumultuous time. He, along with many other officers, suffered torture and cruel, inhumane, and degrading treatment while detained at DGCIM headquarters Boleita in Caracas.

81. On May 16, 2018, DGCIM circulated an intelligence report alleging that commanders from Special Forces units were planning a coup to prevent Maduro's re-election. DGCIM then arrested 30 military officers for allegedly conspiring against the Maduro regime. Like earlier incidents, Cabello went on television and falsely claimed that the arrested individuals were part of a coup termed "Operation Armageddon."

82. Maita's and other similar cases illustrate a wider pattern of unlawful conduct in

22

which DGCIM agents arrive, threaten a target with weapons, and refuse to present an arrest warrant or tell the target what they have been accused of. Once detained, the targets are refused access or communication with family members or legal counsel. The targets are then interrogated and subjected to torture or other cruel, inhuman, or degrading treatment in order to induce a confession that they were involved in a plot to overthrow Maduro or engage in other opposition activity.

83.     Following their torture, regime targets were often presented before the Military Courts of Control, with visible evidence of torture going untreated and without medical evaluation or investigation into the conditions of their detention. Targets are also often denied counsel of their choice and returned to the very same facilities that tortured or mistreated them. During these proceedings, the only evidence presented is typically from confessions given by others arrested in connection with the same incident, who were themselves tortured.

**C.      Maita Endured Unlawful Detention, Brutal Torture, and other Cruel, Inhumane, and Degrading Treatment at the Hands of COS and the Maduro Regime.**

84.     The unlawful acts and omissions alleged in the paragraphs that follow were carried out by named and unnamed perpetrators from among Venezuela's armed forces or intelligence services, conspiring and acting in concert with and for the benefit of the Maduro regime, COS, and the individual Defendants. This common plan, design, and scheme operated to keep the Maduro regime in power by suppressing opposition, spreading fear, and utilizing this environment to maintain control over the COS Criminal Enterprise and the revenue streams derived from its ongoing narco-terrorist operations with FARC.

85.     As further alleged below, Defendants all participated in carrying out the common plan, design, and scheme and, as such, in addition to being personally liable for their own actions, Defendants are also jointly and severally liable for the actions of the other members of their respective chains of command as well as the other members of ACC, its successor, NACC, and COS, all of which were undertaken as part of the common plan, design, and scheme.

86.     The injuries alleged herein were inflicted deliberately and intentionally, under color of law, and under the apparent authority of the government of Venezuela.

**D.      Maita's Arbitrary Detention, Torture, and Coerced Guilty Plea.**

87.      Maita was born in Caracas, Venezuela, where he resided for most of his life along with his family.

88.      In or around 2010, at the age of 19, Maita enlisted in the Venezuelan Army (Fuerza Armada Nacional Bolivariana, or "FANB").

89.      Maita completed his studies at the Venezuelan Military Academy and, approximately one year later, joined the Special Forces. Throughout his military career, Maita demonstrated exceptional service and was promoted on multiple occasions, ultimately attaining the rank of First Lieutenant.

90.      As is widely documented, Venezuela has experienced significant political and economic turbulence under the Maduro regime. Individuals who expressed disapproval of, or voiced opinions not aligned with, the government were routinely subjected to harassment, intimidation, punishment, and persecution. Individuals even suspected of such resistance, such as Maita, were routinely selected, searched, and subjected to human rights violations.

91.      On January 11, 2018, Maita was on duty in the military, performing his usual responsibilities. Without warning, Venezuelan officials working for the Maduro regime (DGCIM) approached Maita and demanded to search his cell phone. Without a search warrant or order for his arrest, Maita was detained and jailed.

92.      During the eight days between his unlawful detention and his presentation hearing, Maita was subjected to severe torture and inhumane treatment by DGCIM officials. The methods of torture inflicted upon Maita included but were not limited to: (a) suffocation by placement of a bag over his head; (b) beatings with sticks and bats; (c) electric shocks administered to his genitals; (d) burns inflicted upon his body; and (e) deprivation of food and water for days at a time.

93.      At his presentation hearing, Maita was informed that an investigation into his case was ongoing. However, there was no evidence of any wrongdoing, no warrant authorizing the search of his belongings, and no order for his arrest. The sole basis for his detention was unsubstantiated suspicion that Maita had previous contact with Oscar Perez, a vocal dissident of the Maduro regime.

94.     Following his presentation hearing, Maita was entitled under Venezuelan law to a preliminary hearing where formal findings and charges would be presented. He did not receive one. Instead, Maita was incarcerated for an entire year without any formal charges being brought against him. Maita was incarcerated in the conditions pictured below:



95.     During this period of prolonged arbitrary detention, Maita continued to endure torture, punishment, and harassment at the hands of DGCIM officials. Political prisoners, such as Maita, were intentionally separated from the general prison population and were routinely beaten and tortured.

96.     In December 2018, approximately one year after his unlawful detention, Maita was finally afforded a preliminary hearing. At this hearing, Maita was charged with Treason to the Motherland, Military Rebellion, and Theft of Military Equipment. There was no evidence to support any of these charges.

97.     Despite the absence of evidence, Maita was presented with an unlawful ultimatum: plead guilty to at least one charge or face a sentence of 30 years' imprisonment for treason. Under duress and following negotiations between his attorney and the presiding judge, Maita was coerced into pleading guilty to Theft of Military Equipment, which carried a minimum sentence of two and

a half years' imprisonment.

98.     In or around May 2020, Maita was released after serving 28 months of his 30-month sentence. Throughout his incarceration, Maita continued to endure inhumane and degrading treatment.

99.     As a direct consequence of the torture and abuse inflicted upon him, Maita suffered severe physical injuries, including damage to his right knee that necessitated surgical intervention.

100.    Although Maita underwent surgery on his right knee while incarcerated, he was denied post-operative rehabilitation, exacerbating injuries and prolonging his suffering.

101.    Upon Maita's release in May 2020, Venezuelan authorities informed him that he was prohibited from ever leaving the country.

102.    In the months following his release, vehicles belonging to counterintelligence agencies within the Maduro regime would periodically drive past Maita's residence, making their presence known as a deliberate form of intimidation and harassment.

103.    The physical, mental, and emotional damage Maita sustained as a result of his unlawful detention, torture, and cruel, inhumane, and degrading treatment is immeasurable. Despite his love for his country and over a decade of proud service to his nation, Maita was left with no choice but to flee Venezuela in the hopes of obtaining safety and a normal life.

104.    Maita made the difficult decision to leave his home and loved ones, seeking refuge in the United States by traveling through Colombia and Mexico.

105.    With assistance from Justice for Our Neighbors, a nonprofit organization, Maita was able to travel from Mexico to the United States and began asylum proceedings.

## VII.    <u>CAUSES OF ACTION</u>

### <u>COUNT I: TORTURE</u>
*(TVPA claim: Against Defendants Maduro, Padrino Lopez, Moreno, Torres, and Figuera)*

106.    Maita repeats and re-alleges each allegation of the foregoing paragraphs as if fully set forth herein.

107.    These claims are brought pursuant to the TVPA by Maita.

108.    The harms to Maita described herein was inflicted by and at the instigation of a public

official and/or other person acting in an official capacity under color of law.

109. Defendants personally participated in the scheme to illegally detain and inflict severe pain and suffering on Maita. Defendants procured, counseled, aided, abetted and assisted others in effecting the common plan, design, and scheme specifically intended to inflict severe pain and suffering for the purposes of procuring coerced confessions to discredit opposition to the Maduro regime and enable Defendants to maintain control over the COS Criminal Enterprise— and the illicit revenue streams derived therefrom—which they required to maintain their unlawful control over Venezuela.

110. From on or about January 11, 2018, Maita was in the custody and/or physical control of Defendants through DGCIM officers acting on their behalf. Several government officials, acting with authority they only had by virtue of their government office, acknowledged that an investigation was opened which resulted in Maita's unlawful arrest and detention.

111. The harms described herein were inflicted deliberately and intentionally for one or more of the following purposes: to punish Maita for an act he was claimed to have committed; to intimidate and/or coerce Maita into refraining from taking actions in opposition to the Maduro regime; and/or to discriminate against him due to his perceived political opposition.

112. The harms described herein were inflicted by and at the instigation of a public official, or other person acting in an official capacity, including the DGCIM officers acting in their official capacity under orders from Defendants.

113. The acts described herein—including, but not limited to, the act of torturing and beating Maita with sticks and bats, asphyxiation, electric shocks to his genitals, and burns—constituted cruel, inhuman or degrading treatment or punishment of Maita.

114. The pain or suffering described herein did not arise from and was not incidental to any lawful sanctions.

115. The acts described herein constitute torture under the TVPA and Maita is entitled to damages as a result.

116. Maita has exhausted all adequate and available remedies to address these acts of torture and extrajudicial killing within Venezuela.

117.     The acts and omissions alleged herein were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT II: VIOLATIONS OF THE LAW OF NATIONS
### *(28 U.S.C. § 1350 claim: All Defendants)*

118.     Maita repeats and re-allege each allegation of paragraphs 1 through 105, as if fully set forth herein.

119.     Maita, at all times relevant to this case, was and is a non-U.S. national.

120.     Defendants personally participated in the scheme to illegally detain and inflict severe pain and suffering on Maita. Defendants procured, counseled, aided, abetted, and assisted others in effecting the common plan, design, and scheme specifically intended to illegally detain and inflict severe pain and suffering on Maita for the purpose of intimidating and/or coercing him from acting in opposition to the Maduro regime.

121.     The wrongful acts described above constitute torture, as well as cruel, inhuman, or degrading treatment or punishment, in violation of Article 7 of the International Covenant on Civil and Political Rights and in violation of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. These acts also violated treaties of the United States and customary international law, as codified in relevant provisions of the international agreements and declarations referenced herein.

122.     Consequently, the torture of Maita is actionable under 28 U.S.C. § 1350.

123.     The acts of extrajudicial torture and other inhuman acts alleged herein constitute crimes against humanity. These acts were committed in a systematic manner and on a large scale; they were instigated and/or directed by the government of Venezuela and carried out by Defendants against a civilian population.

124.     The crimes against humanity alleged herein are actionable under 28 U.S.C. § 1350 because they were carried out in violation of customary international law, as codified in relevant provisions of the international agreements and declarations referenced and listed herein.

125.     Defendants' acts and omissions were deliberate, willful, intentional, wanton,

malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### COUNT III: CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO
### (18 U.S.C. § 1964(c) claim: All Defendants)

126.   Maita repeats and re-allege each allegation of paragraphs 1 through 105, as if fully set forth herein.

127.   Title 18, Section 1962(c) of the United States Code makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

128.   Each named Defendant to this action is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. §1961(3).

129.   FARC, COS, and the Maduro regime form an association in fact for the common and continuing purpose described herein, including, for instance, for the purpose of maintaining unchallenged authoritarian control over Venezuela, furthering the COS Criminal Enterprise, and engaging in: (a) narcotics trafficking; (b) acts of terrorism, including, but not limited to, narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering. The COS Criminal Enterprise constitutes an "enterprise," within the meaning of 18 U.S.C. §1961(4), engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of this enterprise function with several ascertainable structures separate and distinct from that of the conduct of the pattern of racketeering activity.

130.   The Maduro regime, through its control over the COS Criminal Enterprise, operates a vast criminal network intended to escape the sanctions placed upon it by the United States and others as a counter to the Maduro regime's continued unlawful control over Venezuela and the violent terrorist activities it supports and engages in to maintain it. But for the narcotics trafficking activities and money laundering the conspiracy continually caries out in the State of Florida, its acts of terrorism and human rights violations, including kidnapping, torture, and murder, in Venezuela

29

would not be possible.

131. The Maduro regime and the COS Criminal Enterprise have engaged in, and their activities have affected interstate and foreign commerce.

132. Defendants, each of whom are persons associated with or employed by the Maduro regime, the COS Criminal Enterprise, or FARC, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1), 18 U.S.C. §1961(5), and 18 U.S.C. §1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities, organs, powers, and services of the Maduro regime and the COS Criminal Enterprise. Defendants each had the specific intent to engage in the substantive RICO violation alleged herein.

133. Defendants each committed at least two predicate acts of racketeering activity that are indictable under provisions of the U.S. code enumerated in 18 U.S.C. §1961(1), as more specifically alleged below.

134. In violation of 18 U.S.C. § 1962(d), Defendants each knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation and/or management of a RICO enterprise through the pattern of racketeering activities alleged herein.

135. The participation of Defendants in this conspiracy began no later than 2009 and is ongoing to this day.

136. This ultimate purpose of the conspiracy is to maintain Defendants' unlawful exercise of authoritarian control over the organs of the Venezuelan government and, through it, control over the COS Criminal Enterprise, its narcotics trafficking activities, and the illicit revenue streams derived therefrom. Without these illicit revenue streams, substantial portions of which have been laundered through the State of Florida, the conspiracy, which relies upon the distribution of criminal patronage to maintain the support of its loyalists, would cease to function.

137. That purpose is carried out by a conspiracy to engage in the following predicate acts under 18 U.S.C. §1961: (a) kidnapping, arbitrary detention, torture, extrajudicial killing, murder, and bribery, narcoterrorism and other acts of international terrorism, as defined by 18 U.S.C. §1503, against the citizens of either Venezuela or the United States designed to intimidate

and coerce the citizens of either country; (b) narcotics trafficking (21 U.S.C § 841(a)); (c) public corruption offenses, such as bribery (18 U.S.C. § 201) and/or obstruction of justice 18 U.S.C. § 1503); and (d) money laundering (18 U.S.C. § 1856).

138.    Each Defendant committed no fewer than one overt act in furtherance of the conspiracy alleged herein. These acts included, but are not limited to, acts supporting the illegal detention and torture of Maita, and the drug trafficking operations intended to fund the illegal acts of the conspiracy.

139.    To the extent any of the Defendants did not specifically agree to harm Maita, the explicit purpose of the acts they engaged in was the further the overall object of the conspiracy, and the illegal detention and torture of Maita was in furtherance of that same conspiracy.

140.    Defendants' violations of federal law as set forth herein, each of which directly and proximately caused damages to Maita, constituted a continuing course of conduct spanning from at least 2009 to the present, which was intended to obtain money through narcoterrorism, narcotics trafficking, and other unlawful means and, thus, constituted a pattern of racketeering activity under 18 U.S.C §1961(1) and (5).

141.    Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the Maduro regime and the COS Criminal Enterprise through a pattern of racketeering activity in violation of 18 U.S.C §1962(c).

142.    By these actions alleged herein, Maita was directly injured in his business and property, including, but not limited to, the loss of business revenue or employment income, costs of family relocation, immigration expenses, and the loss of value in both real and personal property. Defendants are thereby liable for all such injuries (including treble damages), plus reasonable attorneys' fees and costs.

### COUNT IV: ARBITRARY DETENTION AND TORTURE
*(Venezuelan Law: All Defendants)*

143.    Maita repeats and re-allege each allegation of paragraphs 1 through 105, as if fully set forth herein.

144.    Venezuelan law, specifically the Special Law to Prevent and Punish Torture and

Other Cruel, Inhuman or Degrading Treatment (*Ley Especial Para Previnir Y Sancionar La Tortura y otros Tratos Crueles Inhumanos o Degradantes*) (the "Special Law"), prohibits the acts of torture, cruelty, and inhuman treatment alleged herein. Maita was arbitrarily detained, without cause or due process, and also physically and mentally tortured in violation of the Special Law.

145.    Under Venezuelan law, Maita has a civil cause of action against those who injured as a result of actions taken in violation of the Special Law.

146.    These acts of torture and cruel treatment are also in violation of—or done in furtherance of a conspiracy to violate—several other Venezuelan statutes for which there is civil liability under Venezuelan law, specifically the following provisions of the Venezuelan Criminal Code: Article 176 (prohibits arbitrary deprivation of liberty by public officials); Article 180 A (which prohibits any person in the service of the state from refusing to acknowledge the arrest or give information about disappeared persons); Article 374 (prohibiting rape or threat of rape to a person in custody of the accused); and Article 460 (prohibiting kidnapping and coercion or extortion or conspiracy to commit the same).

147.    Moreover, Article 23 of the Venezuelan Constitution states: "The treaties, pacts and conventions relating human rights which have been executed and ratified by Venezuela have a constitutional rank, and prevail over internal legislation, insofar as they contain provisions concerning the enjoyment and exercise of such rights that are more favorable than those established by this Constitution and the laws of the Republic, and shall be immediately and directly applied by the courts and other organs of the Public Power."

148.    Venezuela is a signatory to the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among other international human rights treaties and conventions. As such, to whatever extent those treaties or conventions are more favorable to Maita than domestic Venezuelan law, those more favorable provisions should be applied pursuant to Article 23 of the Venezuelan Constitution.

149.    Defendants' violations of Venezuelan law, as alleged and set forth herein, directly and proximately caused damages to Maita, including personal injuries, emotional distress, and

economic loss.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Maita respectfully request that this Court award damages to Maita against

Defendants Maduro, Padrino Lopez, Moreno, Torres, and Figuera on Count I, and all Defendants

as to all other Counts, jointly and severally, and grant Maita:

    a.  Compensatory damages for the unlawful detention and torture of Maita, including pain and suffering, emotional distress, loss of advice, solace, counsel, and companionship, economic damages, and injuries to business and property, in the amount of at least $51,000,000, or a sum certain to be determined at trial;

    b.  Punitive or treble damages in the amount of three times the compensatory judgment awarded, as warranted by the law and the facts;

    c.  Prejudgment interest, from January 11, 2018, until the date of judgment;

    d.  Post-judgment interest as calculated at the maximum rate allowable by law;

    e.  Injunctive relief necessary to avoid liquidation or transfer of assets; and

    f.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

A jury trial is demanded on all issues.

Respectfully Submitted,

Dated: February 10, 2026

**STUMPHAUZER KOLAYA
NADLER & SLOMAN PLLC**
2 S. Biscayne Blvd., Suite 1600
Miami, Florida 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Michael B. Nadler*
Michael B. Nadler (FBN: 51264)
Francis D. Murray (FBN: 108567)
Email: mnadler@sknlaw.com
Email: fmurray@sknlaw.com

*Counsel for Maita*